## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 10 2019, 10:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Roberta L. Renbarger
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: K.N., D.N. and Z.N., (Minor Children),

and

H.G., (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

July 10, 2019

Court of Appeals Case No. 19A-JT-309

Appeal from the Allen Superior Court

The Honorable Charles F. Pratt, Judge

Trial Court Cause No.
02D08-1804-JT-140
02D08-1804-JT-141
02D08-1804-JT-142

**Tavitas, Judge.**

# Case Summary

H.G. ("Mother") appeals the termination of her parental rights to her children, K.N., D.N., and Z.N. (the "Children"). We affirm.

# Issue

Mother raises two issues, which we consolidate and restate as whether the evidence is sufficient to support the termination of Mother's parental rights.

# Facts

Mother is the biological mother of K.N., born in March 2007, and twins D.N. and Z.N., born in July 2008.[1] In 2010, the Children were found to be children in need of services ("CHINS") due to neglect of the twins. In 2012, the Children were found to be CHINS again due to physical abuse of K.N. The wardships in both cases were eventually terminated.

Subsequently, the Allen County Department of Child Services ("DCS") became involved with the family again on February 16, 2017. DCS discovered that Mother and the Children were residing in a motel and were unable to pay for another night at the motel and that the Children were hungry and had not eaten since the previous day. Mother claimed to be home-schooling the Children,

---

[1] J.N., father of D.N. and Z.N., is deceased. J.B., father of K.N., consented to the termination of his parental rights.

and the Children had not attended school since October 2016; however, Mother did not have any educational materials. Additionally, Mother was struggling with unmet mental health needs, and Mother tested positive for marijuana on three occasions.

[5] DCS removed the Children from Mother's care and placed them in foster care. As the DCS worker was removing the Children, Mother threatened under her breath to hit and kill the DCS worker and insulted the DCS worker by calling her names. DCS then filed petitions alleging that the Children were CHINS. After a hearing, the trial court found that the Children were CHINS.

[6] In its dispositional order, the trial court ordered Mother, in part, to: (1) refrain from criminal activity; (2) maintain appropriate housing; (3) cooperate with caseworkers and the guardian ad litem ("GAL"); (4) submit to a psychological assessment and follow all recommendations; (5) obtain a drug and alcohol assessment and follow all recommendations; (6) participate in home-based services; (7) submit to random drug screens; and (8) attend visitations with the Children.

[7] Mother's participation in services was limited. Mother was evaluated by Dr. David Lombard for a psychological assessment in June 2017. During the examination, Mother "invalidated several of the psychological tests because she was defensive and not honestly responding to the test items." Ex. p. 232. Dr. Lombard diagnosed Mother with post-traumatic stress disorder ("PTSD") and borderline personality disorder. Dr. Lombard noted that a "long-term pattern

of victimization [of Mother] has resulted in paranoia, anxiety, hypervigilance, low frustration tolerance, social isolation, and emotional volatility—consistent with PTSD." *Id.* Dr. Lombard recommended comprehensive medication management and weekly counseling sessions to address the PTSD. As for the borderline personality disorder, Dr. Lombard found:

> Her responses indicated a pattern consistent with borderline personality disorder. It is recommended that she receive dialectical behavior therapy to treat this long-term maladaptive interpersonal pattern. It is highly likely that her borderline personality disorder has been the cause of significant volatility in her relationships and home life. This condition also caused her to have conflicts with others whenever she perceives they are critical of her. However, dialectical behavior therapy can significantly improve this unhealthy personality disorder pattern.

*Id.* Dr. Lombard saw Mother again in September 2018, but Mother refused to complete another assessment because she thought the questions were "too personal" and not "relevant." Tr. Vol. II p. 20.

[8] The dialectical behavior therapy ("DBT") is a two-part, one-year program comprised of weekly individual therapy and weekly group therapy. Although Mother participated in some weekly individual therapy, she missed many appointments and refused to participate in the group therapy portion of the program. Mother also refused to take the psychiatric medications.

[9] Mother participated in home-based services, but she only completed seventy-five percent of the home-based services program. Mother refused to work on a budget or provide proof of stable housing. At the time of the termination of

parental rights hearing, Mother was residing in her father's house. Mother's father died during these proceedings, and the house was apparently left to Mother's ex-stepmother. Mother, however, continued to live in the house and claimed that she was attempting to get a deed to Father's house through "Federal Court." *Id.* at 210.

[10] In addition, Mother failed to successfully complete the substance abuse assessment. Mother participated in random drug screens at the start of the CHINS proceedings and tested positive for marijuana five times. Mother, however, refused to participate in further random drug screens from a service provider.

[11] Mother regularly visited with the Children. The visitations started as regular supervised visitations but were changed to therapeutic supervised visitations due to Mother's odd behaviors during visits and Mother's behaviors toward staff. Rachel McBride-Alves supervised the therapeutic visitations between Mother and the Children. During the visitations, Mother raised inappropriate topics of conversation in front of the Children. For example, Mother talked to the Children about abuse that she suffered as a child; threatened to sue McBride-Alves; and told the Children stories about men that she claimed to know. Mother spoke inappropriately about the family case manager in front of the Children; told K.N. that people were breaking into her home and that she bought a samurai sword to protect herself; and spoke negatively about the foster parents during visitations with the Children. Mother also told Z.N. that multiple different men were going to adopt her; that Mother is related to the

royal family; that Mother has houses around the world; and that Mother obtained a letter from President Trump stating that the Children should be returned to Mother.

[12] Furthermore, Mother was "defensive" and did not follow McBride-Alves' "redirection very well" during the visits. *Id.* at 103. During a telephone orientation with the visitation supervisor, Mother cursed at the supervisor and refused to follow guidelines regarding talking about the court case or discussing the foster parents in a negative way.

[13] The Children participated in individual therapy with Danielle Allen of Dockside Services, who testified that K.N. is "apathetic and . . . angry" regarding her relationship with Mother. *Id.* at 120. K.N. has problems with defiant behaviors and passive-aggressive behaviors. D.N. is also angry and is working to manage his emotions and increase his self-esteem. Z.N. struggles with hyperactivity, inability to concentrate, low self-esteem, defiant behaviors, severe temper tantrums, and physical aggression toward other children. Z.N. has also threatened suicide. Both D.N. and Z.N expressed that they are fearful of angering Mother.

[14] On May 15, 2018, DCS filed petitions to terminate Mother's parental rights. After hearings in October 2018, the trial court entered findings of fact and

conclusions of law granting DCS's petitions to terminate Mother's parental rights to the Children.[2] Mother now appeals.

## Analysis

Mother challenges the termination of her parental relationship with the Children based on her allegation of insufficient evidence. The Fourteenth Amendment to the United States Constitution protects the traditional rights of parents to establish a home and raise their children. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office,* 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). We recognize that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs.'" *K.T.K.,* 989 N.E.2d at 1230 (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

---

[2] The trial court issued one order addressing K.N. and another order addressing D.N. and Z.N. The findings of fact and conclusions of law in each order are similar.

[16] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re C.G.,* 954 N.E.2d 910, 923 (Ind. 2011). We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)).

[17] Pursuant to Indiana Code Section 31-35-2-8(c), "[t]he trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" when granting a petition to terminate parental rights.[3] Here, the trial court did enter findings of fact and conclusions of law in granting DCS's petition to terminate Mother's parental rights. When reviewing findings of fact and conclusions of law entered in a case involving the termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the

---

[3] Indiana Code Sections 31-35-2-8(a) and (b), governing termination of a parent-child relationship involving a delinquent child or CHINS, provide as follows:

(a) Except as provided in section 4.5(d) of this chapter, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.

(b) If the court does not find that the allegations in the petition are true, the court shall dismiss the petition.

findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[18]  Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (A)   That one (1) of the following is true:
>
>> (i)   The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii)   The court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii)   The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child.
>
> (B) that one (1) of the following is true:

(i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)   There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)  The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child; and

(D)    that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).

[19]    Mother only challenges the trial court's conclusion that the conditions that led to the Children's removal would not be remedied.[4] "In determining whether 'the conditions that resulted in the [Child's] removal . . . will not be remedied,' we 'engage in a two-step analysis.'" *In re E.M.,* 4 N.E.3d 636, 642-43 (Ind.

---

[4] Mother also argues that there was no reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of the Children. The trial court, however, did not find that the continuation of the parent-child relationship posed a threat to the well-being of the Children. As such, we do not address Mother's argument further.

2014) (quoting *K.T.K.,* 989 N.E.2d at 1231). "First, we identify the conditions that led to removal; and second, we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* In analyzing this second step, the trial court judges the parent's fitness "as of the time of the termination proceeding, taking into consideration evidence of changed conditions." *Id.* (quoting *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 152 (Ind. 2005)). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.*

[20] The conditions that led to the removal of the Children included: (1) Mother's struggles with her mental health; (2) Mother's inability to provide housing and food for the Children; (3) Mother's inability to demonstrate that she was home-schooling the Children; and (4) Mother's substance abuse. The trial court found:

> By . . . clear and convincing evidence the court determines that there is a reasonable probability that reasons that brought about the [Children's] placement outside the home will not be remedied. The mother has not completed Dialectical Behavior Therapy. She has not completed a drug and alcohol assessment and has tested positive for the use of marijuana. She is not taking her prescribed medications. She has not successfully completed home based services. The mother's visits with the children have not been expanded from her current therapeutic supervised visits. Notwithstanding the court's interventions in two prior CHINS

adjudications, the Mother has not demonstrated an ability to benefit from services.

Appellant's App. Vol. II pp. 74, 79.

[21] Mother argues that the trial court's finding is clearly erroneous because: (1) Mother had stable appropriate housing at her father's residence; (2) Mother testified that her friend was home-schooling the Children and had supporting documentation; (3) Mother testified that she completed a substance abuse assessment; (4) Mother was uncomfortable with the group therapy portion of the DBT; (5) the psychiatric medication made her sick; (6) the DCS workers should have performed drug screens on Mother instead of referring her to another service provider; and (7) the housing and budgeting portions of the home-based counseling were unnecessary because she was living at her father's house and she was receiving adequate money to care for the Children.

[22] Mother's argument is merely a request to reweigh the evidence and to find Mother more credible than the other witnesses, which we cannot do. DCS presented evidence that Mother has been diagnosed with PTSD and borderline personality disorder. Dr. Lombard recommended medication and weekly counseling to address the PTSD and DBT to address the borderline personality disorder. Mother, however, refused to take the medication, refused to participate in the group therapy portion of DBT, and failed to consistently participate in individual counseling. Mother also: (1) failed to provide evidence that she completed the substance abuse assessment; (2) refused to participate in drug screens with a service provider; (3) failed to advance her visitations beyond

supervised therapeutic visitations with the Children; and (4) has failed to secure stable housing.

[23] Dwila Lewis-Hess, the DCS family case manager, testified:

> [T]he reasons for involvement have not been remedied to date. Mother has not . . . actively engaged in her core [sic] ordered services. Mother has not benefited from her core [sic] ordered services. There seems to be a lot of volatility between Mother and everyone else . . . involved in this case, with service providers and with the Department. . . . Mother still acts inappropriately with the children in visitation. . . . [S]o there's an all-around concern from every aspect of the case.
>
> * * * * *
>
> Mother, to date, has not benefited from any of her core [sic] ordered services. Mother, to date, has not accepted responsibility for the children's involvement and removal from her care. Mother, to date, has . . . had a negative impact on her Children. . . . Mother has been extremely inappropriate with the children in visits, and Mother has made many outlandish statements . . . to the children that are . . . not overall good for their mental stability.

Tr. Vol. II pp. 160-61. The GAL also testified: "[W]e've made little to no progress in the last year and a half." *Id.* at 180. Mother "made it clear" to the GAL that "she sees no reason for services. That she doesn't want to do them and that there is nothing wrong with her parenting . . . ." *Id.* at 181.

[24] Given the evidence presented by DCS and Mother's lack of progress since the Children's removal, there is a reasonable probability that the conditions that

resulted in the Children's removal from Mother's care will not be remedied. The trial court's finding on this issue is not clearly erroneous.

## Conclusion

The trial court's termination of Mother's parental rights is not clearly erroneous. We affirm.

Affirmed.

Crone, J., and Bradford, J., concur.